IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARLA WELLS,**<br><br>                Plaintiff,<br><br>     **v.**<br><br>**MICHAEL J. ASTRUE,**<br>**Commissioner of Social Security,**<br><br>                Defendant. | CASE NO. 11-CV-2583-GPC-(PCL)<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE:**<br><br>**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 14); and**<br><br>**DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT (Doc. 19.)** |

**I.**

**INTRODUCTION**

On November 4, 2011, Plaintiff filed this action pursuant to Section 405(g) of the Social Security Act ("Act"), 42 U.S.C. § 1383(c). Plaintiff seeks judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI of the Act. (Doc. 1.) Plaintiff filed a Motion for Summary Judgment, (Doc. 14), and Defendant filed a Cross-Motion for Summary Judgment (Doc. 19). The Honorable Gonzalo P. Curiel referred the matter to this Court for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   After thorough review of all pleadings and the entire record submitted in this matter, this Court recommends that Plaintiff's Motion for Summary Judgment be **GRANTED** and that Defendant's Cross-Motion for Summary Judgment be **DENIED**.

## II.

## BACKGROUND

**A.    Procedural Background**

Plaintiff Marla Wells filed an application for SSI on March 31, 2008 alleging disability beginning January 4, 2008. (A.R. 96-102.) After Plaintiff's application was denied initially and upon reconsideration, (A.R. 48-52, 57-61), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (A.R. 62-63.) On February 16, 2010 Plaintiff appeared and testified before ALJ Larry B. Parker. (A.R. 28-42.) Plaintiff was represented by counsel Anthony Delellis. (Id.) A vocational expert, Connie Guillory, also appeared and testified at the hearing. (Id.) In a decision dated March 19, 2010, the ALJ determined Plaintiff was not disabled under section 1614(a)(3)(A) of the Act through March 19, 2010. (A.R. 8-17.) In his decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since March 31, 2008, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairment: status post brain surgery for cerebral aneurysm with a residual right sided weakness (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours in an 8 hour workday and stand and walk for 2 hours in an 8 hour workday. She can occasionally use her right hand to forcefully grip, grasp and torque. She can understand remember and carry out detailed but uncomplicated instructions and simple one-two step instructions. She cannot perform complex job instructions. She can maintain concentration and attention for simple repetitive work but not for complex work. She can relate and interact with the public, supervisors and coworkers. She can tolerate low and moderate work stress.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on October 13, 1971 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.968).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since March 31, 2008, the date the application was filed (20 CFR 416.920(g)).

(A.R. 19-24.) On September 7, 2011, the Appeals Council denied Plaintiff's request for review and adopted the decision of the ALJ as the final decision of the Commissioner. (A.R. 1-3.) Plaintiff filed the instant complaint on November 4, 2011, (Doc. 1), and Defendant answered on August 7, 2012 (Doc. 11). On September 12, 2012, Plaintiff filed a Motion for Summary Judgment, (Doc. 14), and Defendant filed a Cross-Motion for Summary Judgment in Opposition to Plaintiff's Motion for Summary Judgment on October 4, 2012 (Doc. 19). This Report and Recommendation addresses both motions pending before it.

## III.

### ADMINISTRATIVE RECORD

**A.  Medical Evidence**

   1.   <u>Treating Physicians</u>

Plaintiff marks the onset of her disability application as January 4, 2008, when she was admitted to Paradise Valley Hospital in National City. (A.R. 304.)  Earlier that night, Plaintiff took methamphetamine. (A.R. 306.)  Plaintiff's sister, LaKucha Zimmerman, found her "thrashing around, not making sense, and not cooperating." (<u>Id</u>.)  Ms. Zimmerman called an ambulance to transport Plaintiff to the hospital. (<u>Id</u>.) Imaging revealed that Plaintiff suffered a stroke (cerebral hemorrhage) requiring immediate surgery. (A.R. 307.)  Dr. White, a neurosurgeon, removed the hemorrhage, (A.R. 316-17), and Plaintiff remained in the hospital through January 17, 2008 to recover (A.R. 304).

As a result of the stroke, Plaintiff lost some functionality on the right side of her body. (A.R. 313.)  She needed assistance with self-care because she was uncoordinated and had difficulty standing. (<u>Id</u>.) Dr. Donna Crowley, a rehabilitation specialist, evaluated Plaintiff to develop an appropriate hospital discharge plan. (A.R. 312.) Plaintiff was initially suspicious and uncooperative. (A.R. 313.) Plaintiff later cooperated, but was restless and required frequent

redirection. (Id.) Her responses were delayed and she had difficulty speaking. (Id.) At discharge, in addition to her post-brain surgery status, Plaintiff's diagnoses included: history of bipolar disorder and psychiatric illness, polysubstance abuse, and hypertension for which she had been noncompliant with treatment. (A.R. 304.) Dr. Crowley had Plaintiff transferred to an acute rehabilitation facility due to Plaintiff's cognitive and self-care impairments. (A.R. 312.) Dr. Crowley is Plaintiff's primary medical advocate, and has followed Plaintiff since her hospital discharge to acute rehabilitation.

In total, Plaintiff was in hospital care for three weeks. Plaintiff remained in acute rehabilitation until January 25, 2008. (A.R. 334-35.) Initially Plaintiff was so restless she required a bedside sitter and a veiled bed to reduce stimulation. (A.R. 312.) Plaintiff was impulsive and stubborn throughout her stay, and concerns for her safety remained although she eventually managed without a sitter. (A.R. 334.) She continued to suffer cognitive impairments, including poor attention, tangential thought process, and poor insight into her impairments. (Id.) Plaintiff remained unsteady on her feet, and was released with a walker and three-in-one commode to ease self-care. (Id.) Plaintiff was discharged home for around-the-clock care, and was directed to follow up with her primary care physician at La Maestra Clinic in National City. (A.R. 334-35.)

On February 6, 2008, Plaintiff saw her surgeon Dr. White, who noted Plaintiff still had difficulty finding words a month after surgery. (A.R. 214.) That same day, Plaintiff followed up at La Maestra for post discharge and blood pressure monitoring. (A.R. 191-92.) Dr. Crowley referred Plaintiff for a psychological assessment by Dr. Rudenberg on February 10, 2008. (A.R. 343-44.) That examination is described in the mental health section below. (infra, at 7.) Dr. Crowley also saw Plaintiff on February 25, 2008 and March 8, 2008, and noted Plaintiff's unsteady gait and poor balance. (A.R. 196, 207.)

On April 18, 2008 Plaintiff presented to Dr. Crowley as dizzy and lightheaded with poor balance and unsteady gait. (A.R. 206, 345.) Plaintiff had fallen twice in the previous two weeks, and Dr. Crowley sent her to the Paradise Valley Hospital emergency room out of concern that Plaintiff may have suffered another stroke. (A.R. 345.) However, Plaintiff's lab results revealed

no further brain injuries and Plaintiff was discharged. (A.R. 346.)

Dr. Crowley also referred Plaintiff to Sun Life Center for Physical Therapy, to work on regaining strength and function on her right side. (A.R. 247.) Plaintiff was assessed on April 23, 2008. (A.R. 247-49.) Physical therapy short term goals included strengthening right side of the body, walking without assistance, and increasing balance. (A.R. 249.) Long term goals were increasing functional capacity, endurance, and use of her right side. (Id.) It is unclear whether Plaintiff was given exercises to perform at home, or expected to return to physical therapy in person.

Plaintiff appears to have considerable difficulty keeping her prescriptions filled. It is unclear from the record whether this is because of financial difficulty, scheduling problems, or other issues. Plaintiff requested medication refills at La Maestra on June 6, 2008. (A.R. 245.) La Maestra records from June 9, 2008 show prescriptions for Nifedipine (for high blood pressure), Depakote (used to treat epilepsy and bipolar disorder), and Seroquel (also for bipolar disorder). (A.R. 242-45.) Plaintiff was next seen for medication refills at La Maestra on January 13, 2009. (A.R. 387.) At that appointment, her blood pressure was so high Plaintiff was advised to go to the ER, but refused to go because no one was available to watch her children. (Id.) On January 20, 2009, Plaintiff returned to La Maestra again seeking medication refills since the pharmacy would not fill her prescription because she was unable to pay. (A.R. 388.)

On October 12, 2009, Plaintiff presented to the emergency room at Paradise Valley Hospital having run out of her blood pressure medication a month before. (A.R. 358.) Her blood pressure was very high at 208/132, and she was experiencing sharp chest pains. (Id.) Plaintiff was stabilized on blood pressure medication, and was discharged home two days later. (Id.) She was seen again at La Maestra on December 24, 2009 for a medication refill since her prescriptions had not been filled since she left the hospital. (A.R. 389.)

2.    Comprehensive Neurological Evaluation:

The Department of Social Services Disability Determination Service scheduled Plaintiff for a neurological evaluation with Dr. Sarah Maze on July 9, 2008. (A.R. 270-77.) At the evaluation, Plaintiff stated that prior to her initial hospitalization she experienced a sensation of "spinning"

and her family members described her as "screaming out with head pain." (A.R. 272.) Plaintiff stated she had no memory of the next two weeks, and was hospitalized for a month. (Id.)

During the assessment, Plaintiff told Dr. Maze she has weakness in her right arm and leg and fell while taking her children to school. (Id.) Plaintiff described being forgetful and confusing the names of her children. (Id.) Plaintiff also described losing coordination such that she can no longer braid her daughter's hair, her handwriting had become poor, and her children have to support her as she walks up and down stairs in their two story home. (Id.) Plaintiff stated that her speech is slower when she is tired. (Id.) Dr. Maze described Plaintiff's speech as simplistic. (A.R. 273.) Plaintiff also had a reduced general fund of knowledge, and did not know past presidents or common geography. (Id.) Plaintiff's intelligence appeared to be in the dull normal range. (Id.) She was able to follow one and two part instructions. (Id.)

When describing her other medical conditions, Plaintiff stated she's had high blood pressure for ten years. (Id.) Plaintiff acknowledged she controlled her blood pressure poorly in the past, but reported better control recently with medications. (Id.) Plaintiff stated her bipolar symptoms have also improved with medication. (Id.) Plaintiff had been prescribed Depakote and Seroquel to manage her bipolar disorder, and Procardia, Catapres, and Lopressor to control her blood pressure. (Id.) Plaintiff was also taking Protinix for heartburn. (Id.) Dr. Maze described Plaintiff as having decreased insight into her medical problems. (Id.)

Plaintiff reported having five children, aged five, seven, nine, thirteen and seventeen years old. (Id.) She stated that she lives alone with her children, and has a friend who visits every other day and telephones daily. (Id.) Plaintiff's seventeen year old child helps with grocery shopping. (Id.)

Plaintiff was a poor historian during the assessment, and Dr. Maze had no medical records to reference during their appointment. (A.R. 275.) However, based on what she observed, Dr. Maze concluded that Plaintiff suffered a stroke leading to right side body weakness. (Id.) Dr. Maze found that Plaintiff is able to stand and walk on her own. (Id.) She determined that Plaintiff was able to occasionally lift 20 pounds and frequently lift 10 pounds. (Id.) Dr. Maze found that Plaintiff is able to sit for six hours in an eight hour workday with normal breaks. (Id.)

Plaintiff is able to use her hands without restriction and perform fine motor activities with her arms. (<u>Id</u>.) Dr. Maze also concluded that Plaintiff has no restriction in her feet, and can perform fine motor activities with her legs. (<u>Id</u>.)

3.   <u>Physical Residual Functional Capacity Assessment</u>:

On July 9, 2008, Dr. G. Spellman completed a Physical Residual Functional Capacity Assessment based on Plaintiff's available medical records. (A.R. 278-82.)

At the time of the assessment, Dr. Spellman determined that Plaintiff was able to lift and carry twenty pounds occasionally, and ten pounds frequently. (A.R. 279.) Dr. Spellman found that Plaintiff is able to stand or walk two hours per day, sit six hours per day, and that her push and pull abilities were unlimited. (<u>Id</u>.) Although the form instructs doctors to provide explanations for their findings based on available medical evidence, Dr. Spellman provides no such explanation. (<u>Id</u>.)

Dr. Spellman determined that Plaintiff should never engage in climbing or balancing activities, but can stoop, kneel, crouch or crawl occasionally. (A.R. 280.) Again, despite prompting, Dr. Spellman provided no reference to the medical records to substantiate his conclusions. (<u>Id</u>.) Dr. Spellman found that Plaintiff had absolutely no manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (<u>Id</u>.) Dr. Spellman provided no evidence for any of these conclusions. (A.R. 280-81.) Dr. Spellman concluded that Plaintiff's treating source statements are consistent with his own findings. (A.R. 282.)

**B.   Mental Health Evidence:**

1.   <u>Psychologist Referral</u>:

Dr. Crowley, a rehabilitation specialist, referred Plaintiff for a psychological evaluation with psychologist Dr. Murray Rudenberg, PhD. (A.R. 343-44.) Dr. Rudenberg evaluated Plaintiff on February 10, 2008. (<u>Id</u>.) Dr. Rudenberg found that Plaintiff had been a polysubstance abuser since age 10, and had been using methamphetamine daily for a year prior to her hospitalization. (A.R. 343.) Plaintiff had poor insight into her substance abuse, and unrealistic goals for her recovery. (<u>Id</u>.) Dr. Rudenberg determined Plaintiff likely had diagnosable adjustment disorder with depressed mood, but clearly stated that substance recovery should be

1   Plaintiff's primary psychological treatment goal. (Id.) It is worth noting that the record does not

2   indicate that Plaintiff abused any substance since her hospitalization for stroke.

3        2.   <u>Comprehensive Psychiatric Evaluation:</u>

4        The Department of Social Services Disability Determination Service scheduled Plaintiff for

5   a complete psychiatric evaluation with Dr. Gregory Nicholson on June 23, 2008. (A.R. 252-57.)

6   Dr. Nicholson had none of Plaintiff's psychiatric records for reference during the assessment.

7   (A.R. 252.)

8        Plaintiff told Dr. Nicholson that she was depressed about symptoms related to her medical

9   condition, including difficulties with the right side of her body and needing physical and speech

10   therapy. (A.R. 252.) Plaintiff presented to Dr. Nicholson with depressive symptoms, including

11   "depressed mood, insomnia, decreased appetite, difficulty concentrating, decreased energy,

12   decreased interest in normal activities, and crying spells." (Id.) Plaintiff was not suicidal,

13   psychotic, or anxious. (A.R. 253.) She stated she experimented with crystal meth and marijuana

14   in high school, but did not currently use either alcohol or other drugs. (Id.) Plaintiff reported no

15   difficulties with dressing, bathing, or hygiene, and stated she could pay her own bills, manage

16   cash, and go out in public on her own. (Id.)

17        Based on her presentation, Dr. Nicholson determined that the Plaintiff is able to understand

18   and carry out two-step job instructions. (A.R. 256.) Plaintiff is able to do detailed and complex

19   instructions. (Id.) However, Dr. Nicholson found that Plaintiff's ability to relate to and interact

20   with co-workers and the public was moderately limited. (Id.) Plaintiff was found to be mildly

21   limited as to her ability to maintain concentration, attention, persistence and pace. (Id.) Dr.

22   Nicholson also determined Plaintiff's ability to associate with day-to-day work activity,

23   including attendance and safety is moderately limited. (A.R. 257.) Plaintiff's ability to accept

24   instructions from supervisors was found to be mildly limited. (Id.) Dr. Nicholson also concluded

25   that Plaintiff's ability to maintain regular attendance and perform work activities consistently

26   was mildly limited. (Id.)

27   ///

28   ///

**C.   Disability Reports**

    1.   Plaintiff's Disability Report:

    Plaintiff completed an Adult Disability Report Form SSA-3368 as part of her initial SSI application. (A.R. 150-57.) She reported that the conditions limiting her ability to work are epilepsy, brain surgery, bi-polar disorder, and high blood pressure. (A.R. 151.) When asked to describe how she is limited by her conditions, Plaintiff responded, "I can't use the right side of my body - it's kind of weak. I'm getting better, but the right side of my body is still messed up. I can't walk long distances and I can't stand for longer than 30 minutes." (A.R. 151.) Plaintiff reported her conditions cause her pain. (A.R. 151.)

    Plaintiff reported that she has worked in the past, but has not worked since March 1, 1993. (A.R. 151.) Plaintiff reported her past work included a camp supervisor for two years, a cashier for one year, and a landscaper for two months. (A.R. 152.) The camp supervisor job, where Plaintiff planned outings for kids, was Plaintiff's longest term of employment. (Id.) In her report, Plaintiff stated she is 5'7" and 236 pounds. (A.R. 150.) She stated she can read and write in English. (A.R. 150.) The highest grade she completed is 12th grade. (A.R. 156.)

    Plaintiff also completed the Disability Report Appeal Form SSA-3441. (A.R. 161-67.) Plaintiff stated her symptoms had become worse and she was "seeing things that are not there," experiencing short-term memory loss, and not wanting to get out of the house. (A.R. 162.) Plaintiff indicated her symptoms are so bad that she just wants to stay in bed and let her seventeen-year-old son cook for the family. (Id.)

    Plaintiff completed an additional Disability Report Appeal Form SSA-3441. (A.R. 171-77.) She reported becoming increasingly depressed. (A.R. 172.) Plaintiff also reported seeing her doctor for right side weakness, chest pain, and speech difficulties. (A.R. 173.) When asked how her conditions affect her self-care, Plaintiff responded, "I can not do things by myself. I move very slow. I can't use my right hand to wash my hair or shave." (A.R. 175.)

///
///
///

**D.   Function Reports**

1.   <u>Plaintiff's Function Report</u>:

Plaintiff completed a function report describing her physical and mental health limitations on April 4, 2008. (A.R. 131-38.) When asked to describe her daily activities, Plaintiff reported she wakes up, takes her medications, and helps prepare her children for school. (A.R. 131.) Then she stays home watching television until her children return from school. (<u>Id</u>.) Plaintiff reported that her primary activities are watching television and talking on the phone. (A.R. 135.) During the day Plaintiff takes another round of medications, and tries to assist her children with their homework. (<u>Id</u>.) Plaintiff stated that either her kids or somebody else prepares dinner for the family. (<u>Id</u>.) In the evening, Plaintiff takes a third round of medications, watches television, and falls asleep. (<u>Id</u>.)

When asked whether Plaintiff cares for anyone else, Plaintiff replied that she is responsible for her children, but notes "they take care of me," indicating some inability to provide self-care. (A.R. 132.) Plaintiff appears to rely heavily on her oldest child. (<u>Id</u>.) Plaintiff reported that she has regular contact with others, and that "people call to see how [she's] doing everyday." (A.R. 135.) She reported that since her brain surgery she tries to avoid stressful situations. (A.R. 137.) When asked how well she follows written instructions, Plaintiff responded "I haven't had that many." (A.R. 136.) When asked how well she responds to spoken instructions, Plaintiff states she needs them to be slowed down. (<u>Id</u>.)

Plaintiff stated that before her stroke she was able to cook for herself, but now she cannot. (A.R. 132.) She is only able to prepare oatmeal made in the microwave. (A.R. 133.) She is unable to use a stove by herself, although she is re-learning how to use the stove and cook "little by little." (<u>Id</u>.) Plaintiff complained that the right side of her body is "messed up." (<u>Id</u>.) She stated that she is unable to sleep without medications. (<u>Id</u>.) Plaintiff stated she cannot comb her own hair without assistance. (<u>Id</u>.) Plaintiff relies on taking medications laid out for her in a marked pill box prepared by a care taker. (A.R. 133.) Plaintiff reported that she is unable to do any house chores other than laundry, which takes her all day. (<u>Id</u>.) She has a care giver (her sister) who does all other house chores. (<u>Id</u>.) Plaintiff stated it takes her all day to do the laundry.

(Id.) She does no yard work. (A.R. 134.)

She reported difficulties with lifting, squatting, bending, standing reaching, walking, talking, and climbing stairs. (A.R. 136.) Plaintiff also reported difficulty with memory, concentration, following instructions and completing tasks. (Id.) She states she is only able to walk for no more than 10 minutes before needing to rest for 5 minutes. (Id.) She uses a walker and the three-in-one commode prescribed by her doctor. (A.R. 137.) Plaintiff reports that since her hospitalization, her handwriting has become poor. (A.R. 138.)

Plaintiff stated she does not need assistance with bathing, shaving, feeding herself, or using the toilet. (Id.) She stated she is able to handle money and can pay bills and count change. (A.R. 134.) Plaintiff is able to go outside about three times per week, but never leaves home by herself for fear of falling. (A.R. 134.) When she goes shopping every other week, someone is always with her. (Id.) She stated she relies on a walker when she is away from home. (A.R. 135.)

2.   Third Party Function Report:

Plaintiff's sister, LaKucha Zimmerman, completed a third party function report on April 16, 2008 describing Plaintiff's physical and mental health limitations. (A.R. 139-49.) Ms. Zimmerman stated she has known Plaintiff for 36 years. (A.R. 142.)

Prior to Plaintiff's illness, Ms. Zimmerman said Plaintiff was able to take care of herself and do everything on her own. (A.R. 143.) She states that now Plaintiff is only able to make sandwiches and microwave food. (A.R. 144.) Plaintiff is no longer able to use the stove by herself. (Id.) Ms. Zimmerman reported that she cooks meals for Plaintiff that last two days at a time. (A.R. 142.) Ms. Zimmerman also does Plaintiff's laundry and cleans her house. (Id.) However, Plaintiff does occasionally do minimal housework, such as loading the dishwasher, vacuuming, and sweeping. (A.R. 144) Ms. Zimmerman said that when Plaintiff is able to engage in chores, it takes her a long time. (Id.) She reported, "I mostly do the real house cleaning - it takes her [Plaintiff] too long to do anything now days." (A.R. 145.)

Ms. Zimmerman said, "Marla was very active before her illness now she's not sure of herself." (A.R. 146.) Since her stroke, Plaintiff goes outside one to two times daily, but cannot go out alone because she is still unstable. (A.R. 145.) Ms. Zimmerman reported Plaintiff goes out

shopping for 30 to 45 minutes approximately two times per month. (Id.) Ms. Zimmerman reported Plaintiff spends time with others when they come to visit and help with chores. (A.R. 146.) Plaintiff goes to church, but does not have many other social activities and she needs to be accompanied. (Id.) She reported that Plaintiff uses her walker every day for outside activities. (A.R. 148.) Plaintiff's primary activity is watching television because she remains in one place all day. (A.R. 146.)

When asked to describe Plaintiff's limitations Ms. Zimmerman reported, "Since her stroke she does not have full ability in her right hand and her walking is not steady." (A.R. 147.) Ms. Zimmerman said Plaintiff is only able to walk for 10 minutes before needing to rest. (Id.) She stated that Plaintiff has difficulty with lifting, squatting, bending, standing, walking, kneeling, using her hands, and stair climbing. (A.R. 147.) Plaintiff also had difficulty with talking, seeing, memory, completing tasks, concentration, understanding, and following instructions. (A.R. 147.)

Ms. Zimmerman stated that Plaintiff does not handle stress well because "she gets upset because she can't express herself the way she sees." (A.R. 148.) She reported that Plaintiff does not handle changes in routine well because "routine is everything to her, one change throws her off." (A.R. 148.) Ms. Zimmerman stated Plaintiff is only able to pay attention for 15-20 minutes at a time. (A.R. 147.) Ms. Zimmerman noted that Plaintiff has difficulty sleeping and is "up and down all day." (A.R. 143.)

Ms. Zimmerman fills her sister's pillbox weekly so Plaintiff will take her medications as directed. (A.R. 144.) Ms. Zimmerman notes that Plaintiff does not have any problems with dressing, bathing, feeding herself, or maintaining basic hygiene. (A.R. 143.) Ms. Zimmerman reported that Plaintiff cares for her children by directing them to shower, eat, and do their homework. (Id.) Although Ms. Zimmerman believes Plaintiff is able to pay bills and count change, (A.R. 145), Plaintiff never does these activities without Ms. Zimmerman's help (A.R. 146).

///

///

///

**D.   Administrative Hearing**

    1.   <u>Plaintiff's Testimony</u>

Before ALJ Larry B. Parker, Plaintiff testified regarding her medical and mental health conditions and consequent limitations. (A.R. 28-42.) Plaintiff testified in person and was represented by her attorney, Anthony Delellis. (A.R. 28.) When prompted by the ALJ, she agreed to amend her onset date from January 4, 2008 to March 31, 2008. (A.R. 31.)

Plaintiff affirmed that past work included camp supervisor, cashier, and landscaper. (A.R. 32.) Plaintiff also affirmed her alleged conditions are epilepsy, high blood pressure, status post brain surgery, and bipolar disorder. (<u>Id</u>.) Plaintiff affirmed her past history of substance abuse. (<u>Id</u>.) At the hearing, Plaintiff testified that she weighed 231 pounds and is 5 feet 7 inches tall. (A.R. 35.) Plaintiff testified that she has approximately 12 years of education. (A.R. 31.)

Plaintiff testified about her stroke. (A.R. 32.) She told the ALJ that she used methamphetamine the night before she was hospitalized on January 4, 2008. (A.R. 33.) Plaintiff testified that she has not used any illegal substances or alcohol since that day. (A.R. 32.)

Plaintiff told the ALJ that the stroke made the right side of her body weak. (A.R. 33.) She stated, "I had to learn how to talk, walk and cook and all that stuff again because my therapist didn't want me to get close to the oven." (A.R. 34.) She testified as to weakness in her right leg. (A.R. 35.) Plaintiff stated she was picked up from home and taken to physical therapy in National City. (A.R. 34.) Plaintiff stated that she is unable to stand for long periods of time because it makes her back hurt, she cannot breathe, and she has to use an inhaler. (A.R. 33, 35.) She stated that she is afraid of falling if she walks to quickly, but is able to walk a block slowly. (A.R. 35.) Plaintiff testified that she had fallen in the past rushing to get her children to school. (<u>Id</u>.)

Plaintiff also testified about losing function in her right hand. (A.R. 33-35.) She told the ALJ that her handwriting has become poor. (A.R. 33.) Plaintiff stated that she has three daughters, and is no longer able to do their hair as a result weakness and painful cramping in her hands. (<u>Id</u>.) Plaintiff testified after two or three minutes of using her right hand it hurts, and she has to stop what she's doing and stretch her hand. (A.R. 33, 35.) She stated that she is right-

handed, but since her stroke her left hand is stronger than her right hand. (A.R. 35.)

Plaintiff testified that a psychiatrist was treating her for bipolar disease and depression. (A.R. 36.) The first time she visited the psychiatrist was prior to her stroke. (Id.) Plaintiff testified that she takes her medications every day as prescribed. (A.R. 37.) Plaintiff stated that her memory is poor. (A.R. 34.) Plaintiff testified that since the stroke she has reduced tolerance for frustration. (A.R. 37.) Plaintiff told the ALJ, "I'm easily aggravated so any little thing gets on my nerves. I get mad at any little thing." (Id.) She testified that she has trouble speaking that she did not have before her stroke. (Id.)

Plaintiff affirmed that her blood pressure has historically been uncontrolled. (A.R. 37-38.) Plaintiff testified that she now takes her medications every day. (A.R. 37.) Regarding medication compliance for her hypertension, Plaintiff stated, "Yeah, I've got to take that again because I just went to the hospital, they was trying to get it down because it was high because I was worried about something." (A.R. 37-38.)

Plaintiff testified that her condition has not improved since her stroke. (A.R. 34.) She stated that she was completely paralyzed on the right hand side of her body for a year after the stroke. (Id.) When asked if she could do any kind of work Plaintiff responded that she is unable to stand for a long period of time. (A.R. 36.)

2.  <u>Vocational Expert's Testimony</u>

Vocational expert Ms. Connie Guillory testified at the hearing on the issue of Plaintiff's capacity to work, despite her conditions. (A.R. 38.) The ALJ posited a hypothetical asking the vocational expert to consider whether work existed in the national economy for an individual with the following capacity: a high school education, able to lift 20 pounds occasionally, 10 pounds frequently, stand and walk two hours in an eight hour day; never climbing on a ladder, rope, scaffold, ramp or stairs; and never near unprotected heights, heavy machinery, or large open bodies of water. (A.R. 39.)

Ms. Guillory testified that work does exist in the national economy for such an individual (Id.) She categorized such work as "unskilled sedentary." (A.R. 39.) Ms. Guillory testified that jobs fitting within this category included inspector/tester, hand packager, and assembler. (A.R.

40.) Ms. Guillory testified that such work existed in significant numbers for all three positions in the local economy and at large numbers in the national economy. (Id.) Ms. Guillory testified that since Plaintiff has no transferable skills or significant work history, the jobs she qualifies for are limited to unskilled labor. (A.R. 40-41.)

The hypothetical was then adapted by Plaintiff's counsel. (A.R. 41.) Plaintiff's counsel asked whether, in the same hypothetical, there would be jobs available to an individual who could use her right upper extremity only occasionally. (Id.) Ms. Guillory testified that there would be no work for someone fitting that description. (Id.)

**E.    ALJ Decision:**

The ALJ determined that Plaintiff was not disabled under section 1614(a)(3)(A) of the Act. (A.R. 17.)  He found that Plaintiff's post brain surgery status and residual right sided weakness were severe impairments. (A.R. 19.) The ALJ also identified Plaintiff's depressive disorder and substance dependence disorder in remission. (Id.) However, the ALJ concluded that "[t]hese impairments do not, either individually or in combination, cause even minimal limitations in the claimant's work related abilities," and as such were not severe impairments (Id.)

The ALJ found that Plaintiff's physical and mental health impairments do not meet or medically equal any impairment listed under 20 CFR Part 404, Subpart P, Appendix 1. (Id.) "Paragraph B" of the mental health criteria is met when a claimant shows multiple "marked" impairments, or at least three episodes of decompensation, each lasting at least two weeks. (Id.) The ALJ concluded that Plaitniff has "mild," but not "marked," impairments with activities of daily living, social functioning, and concentration, persistence and pace. (A.R. 20.) The ALJ also concluded that Plaintiff suffered two episodes of decompensation, but not the requisite three required in the criteria. (Id.) Therefore, the ALJ reasoned that Plaintiff did not meet a mental health listing. (Id.)

The ALJ concluded that, based on the entire record, Plaintiff has the following residual functional capacity:

"[Plaintiff] can lift and carry 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours in an 8 hour workday and stand and walk for 2 hours in an 8 hour workday. She can occasionally use her right hand to forcefully grip, grasp and torque. She can understand

remember and carry out detailed but uncomplicated instructions and simple one/two step instructions. She cannot perform complex job instructions. She can maintain concentration and attention for simple repetitive work but not for complex work. She can relate and interact with the public, supervisors and coworkers. She can tolerate low and moderate work stress."

(A.R. 20-21.)

The ALJ identified Plaintiff's brain surgery, and the subsequent cognitive impairments and impairments in self-care immediately following surgery. (A.R. 21.) The ALJ noted that Plaintiff's neurological examination revealed that "she was restless, had no facial asymmetry, had some dis-coordination on the right and some significant standing/balance difficulties." (Id.) The ALJ noted that Plaintiff needed assistance after her surgery with simple self care. (Id.) When describing Plaintiff's early limitations, the ALJ referenced medical records from Paradise Valley Hospital, including records from Dr. Crowley, and Plaintiff's surgeon, Dr. White. (Id.)

But, the ALJ remarked, Plaintiff improved significantly in less than 12 months. (Id.) The ALJ noted she was no longer using methamphetamine, was able to care for herself at home without an aide, and had significantly improved in her limitations. (Id.) The ALJ references the record but makes no specific citations here. (Id.) Based on Plaintiff's improvements, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause her symptoms. (Id.) However, the ALJ concluded that Plaintiff's statements about the intensity of her symptoms lacked credibility to the extent they were inconsistent with the residual functional capacity assessment. (Id.)

The ALJ then proceeded to provide "clear and convincing" reasons for finding the Plaintiff not credible in the form of a bulleted list. (A.R. 22.) In the list, the ALJ discredited Plaintiff's testimony because her pain medications do not indicate disabling pain. (Id.) He listed that Plaintiff was discharged home, after being hospitalized for "only a month." (Id.) Upon discharge, the ALJ listed that Plaintiff had "only occasional word finding difficulty and she was successfully walking with a walker." (Id.) The next bullet identified findings from Dr. Maze's neurological examination, which mirrored the residual functional capacity adopted by the ALJ above. (Id.)

The ALJ stated that Plaintiff has a substance abuse disorder now in remission with no

current use, and that Plaintiff was diagnosed with adjustment disorder with depressed mood. (Id.) As to Plaintiff's other psychiatric contacts, the ALJ listed Dr. Nicholson's assessment that Plaintiff had a GAF score of 65, mild limitations in work activities, moderate limitations relating to co-workers, appropriate thought content, and diagnosis of depression not otherwise specified. (Id.) He listed that Plaintiff has had no psychiatric hospitalizations, and is not receiving mental health treatment. (Id.)

The ALJ adds further bullet points identifying information regarding Plaintiff's physical health. He recorded Plaintiff's October 12, 2009 hospitalization for "malignant hypertension" when Plaintiff had been without blood pressure medication for one month. (Id.) The ALJ bulleted Plaintiff's ability to care for her personal needs without assistance, her lack of psychotic thought content, and her ability to participate in her hearing. (A.R. 23.) This information concludes the bullet point list of the ALJ's reasons for discrediting Plaintiff's subjective symptom testimony. The ALJ reported giving the opinions of Dr. Maze and Dr. Nicholson "great weight" because of their medical expertise and evaluation of the Plaintiff in person. (Id.)

The ALJ then found, based on his determination of Plaintiff's residual functional capacity and testimony from the vocational expert, that Plaintiff was able to participate in sedentary work. (A.R. 24.) Such work was found to be available in significant numbers in the national economy. (Id.) Therefore, concluded the ALJ, Plaintiff was not disabled from March 31, 2008 through March 19, 2010, the date of his decision. (Id.)

## IV.

### STANDARD OF REVIEW

To qualify for disability benefits under the Act, an applicant must show that: (1) She suffers from a medically determinable impairment that can be expected to result in death or last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that she previously performed, or any other substantially gainful employment that exists in the national economy. See 42 U.S.C.A. § 423(d)(1)(A), (2)(A) (West 2004). An applicant must meet both requirements to be considered "disabled." Id.

///

**A.    Sequential Evaluation of Impairments:**

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work she has done in the past. If so, the claimant is not disabled. If not, the evaluation proceeds to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 CFR § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.    Judicial Review**

Sections 206(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 547 F.3d 1101, 1104 (9th Cir. 2008)(quoting Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision

11-CV-2583-GPC-(PCL)

1  must be affirmed. Id. (citation and quotations omitted).

2      Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the

3  decision of the Commissioner's decision. 42 U.S.C. § 405(g). This matter may also be remanded

4  to the Social Security Administration for further proceedings. Id. Furthermore, "[a] decision of

5  the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679

6  (9th Cir. 2005).

7                                      **V.**

8                                **DISCUSSION**

9      Plaintiff argues that the ALJ's erred in denying her application on three grounds. (Doc. 14,

10  at 6-8.) First, Plaintiff argues that the ALJ's finding that Plaintiff's depressive symptoms were

11  non-severe is not supported by substantial evidence. (Doc. 14, at 6.) Second, Plaintiff argues the

12  ALJ's residual functional capacity assessment failed to include functional limitations described

13  by Dr. Nicholson. (Doc. 14, at 7.)  Third, Plaintiff argues that the ALJ erred by failing to

14  acknowledge Plaintiff's functional limitations as described by her sister, LaKucha Zimmerman,

15  in a Third Party Function Report. (Id.) This Court addresses each of Plaintiff's arguments in turn,

16  and finds cause to remand this case back to the ALJ for correction of legal errors.

17  **A.   The ALJ's Finding that Plaintiff's Depression was Non-Severe:**

18      Plaintiff argues that the ALJ minimized the severity of Plaintiff's mental health conditions

19  at Step 2 of the Sequential Evaluation Process. (Doc. 14, at 6.) The ALJ found Plaintiff's mental

20  health conditions to be "non-severe," but determined her post-brain surgery status was "severe."

21  (A.R. 19.) Plaintiff asserts that properly taking Dr. Nicholson's report into account would have

22  raised Plaintiff's mental health conditions to the "severe" level. (Doc. 14, at 6.) This Court finds

23  that the ALJ's severity analysis at Step 2 does contain error, but that such error was ultimately

24  harmless.

25      Once an ALJ determines a claimant is not engaged in substantial gainful activity at Step 1,

26  he must consider whether Plaintiff's conditions are severe in Step 2. See 20 C.F.R. §

27  404.1520(a)(4)(I). The severity test is a "de minimis screening device to dispose of groundless

28  claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996)(citing Bowen v. Yuckert, 482

U.S. 153-54, 107 (1987). At Step 2, the ALJ is required to consider "the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe." Id. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Id.; (citing Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) adopting SSR 85-28).

If a claimant's work activities may be limited by a mental health impairment, the ALJ must employ a "special technique" for evaluating the severity of those limitations. 20 C.F.R. § 404.1520a(b-e)(describing the "special technique" in detail.) First, under the "special technique," the ALJ must identify a claimant's medically determinable mental health impairments. 20 C.F.R. § 404.1520a(b)(1). Second, if an impairment exists, the ALJ must rate the degree of impairment in four functional areas essential to a claimant's ability to work: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace, or 4) episodes of decompensation."

At Step 2 of the instant case, the ALJ cites no medical records either substantiating the existence of Plaintiff's impairments, or substantiating his conclusion that Plaintiff's mental health impairments are non-severe. (Id.) Rather, the ALJ combines the Step 2 determination of symptom severity with the Step 3 determination of whether impairments meet or equal a listing. This combined approach is apparent because the ALJ's "special technique" analysis is used to demonstrate that Plaintiff's impairments do not meet a listing at Step 3, but not to determine severity at Step 2. (A.R. 19-20.) But because Step 2 operates as a de minimis threshold inquiry it is fundamentally different from Step 3 and should be treated as such. See Soc. Sec. Rul. 86-8. Further, the direction that "we must follow [the] special technique at each level in the administrative review process" does not imply permission to shortcut steps in the sequential review process. See 20 C.F.R. § 404.1520a(a).

The ALJ's lack of explanation at Step 2 is therefore an error in applying the sequential evaluation process. However, Plaintiff's concern that Dr. Nicholson's report was not properly incorporated at Step 2 is ultimately harmless since Plaintiff's claim proceeded to Step 5 rather than being denied at Step 2. See Lewis v. Astrue, 498 F.3d 909 (9th Cir. 2007)(where ALJ's

1   omission of one of claimant's limitations at Step 2 was a harmless error, because the claim

2   proceeded through Step 5, and the limitation was assessed in later steps.)

3       The ALJ does incorporate Dr. Nicholson's findings into his determination that Plaintiff's

4   the Plaintiff's residual functional capacity ("RFC") determination.  We assess below whether the

5   ALJ's use of Dr. Nicholson's findings in the RFC were legally sufficient to conclude that

6   Plaintiff is not disabled.

7   **B.   The ALJ's RFC Determination is Deficient**

8       Plaintiff argues that Dr. Nicholson's assessments of Plaintiff's limitations were not properly

9   incorporated into the RFC at Step 4. (Doc. 14, at 7.) This Court finds that Plaintiff has failed to

10  articulate how a different reading of Dr. Nicholson's assessment could have lowered Plaintiff's

11  RFC. We cannot conclude that the RFC is deficient as a result of failure to use Dr. Nicholson's

12  report. We do, however, find the RFC deficient on other grounds.

13      If a claimant is unable to do past work, a residual functional capacity assessment (RFC) is

14  made at Step 4 to determine what work, if any, Plaintiff is able to do. 20 C.F.R. § 404.1545. An

15  RFC takes into account all of Plaintiff's impairments in combination, including those not

16  considered "severe," based on all relevant evidence in the record. 20 C.F.R. § 404.1545(e). An

17  RFC is legally defective if it fails to take into account all of a Plaintiff's limitations. Samples v.

18  Commissioner of Social Sec. Admin., 466 Fed.Appx. 584 (9th Cir. 2012). If the RFC is

19  defective, then hypotheticals based on the RFC are also defective, leading to an inadequate

20  assessment of work available to a claimant at Step 5. Id.

21      In the instant case, Plaintiff was found to be able to engage in sedentary work based on the

22  RFC. (A.R. 23-24.) The ALJ stated he gave "great weight" to Dr. Nicholson's opinions in his

23  RFC determination. (A.R. 22.)  Plaintiff disagrees by merely pointing to two excerpts from Dr.

24  Nicholson's report as conclusive proof that the ALJ "rejected" Dr. Nicholson's findings. (Doc.

25  14, at 7.)  In the first excerpt, Dr. Nicholson states Plaintiff is moderately limited in her ability to

26  relate and interact with co-workers and the public. (Id.) But contrary to Plaintiff's assertions, the

27  ALJ specifically cited this excerpt in his decision. (A.R. 22.) In the second excerpt, Plaintiff cites

28  Dr. Nicholson's finding that Plaintiff is moderately limited in her ability to associate with day-

to-day work activity, including attendance and safety. (Doc. 14, at 7.) While it is true that the ALJ did not specifically cite this excerpt, (A.R. 22), Plaintiff fails to demonstrate how this failure substantiates her assertion that Dr. Nicholson's report was not given proper weight (Doc. 14, at 7).  The ALJ cites Dr. Nicholson's report several times in his decision. (A.R. 22-23.) Without a clearly articulated argument from Plaintiff as to how Dr. Nicholson's opinions exceeded the RFC, it is impossible to conclude, as Plaintiff suggests, that the ALJ "ignored" or "rejected" Dr. Nicholson's reports. (See Doc. 14, at 7.)

The RFC is defective, however, for failing to take Ms. Zimmerman's Third Party Function Report into account.  We assess the ALJ's failure to account for Ms. Zimmerman's statements below.

**C.  The ALJ Erred by Not Addressing the Third Party Function Report**

This Court agrees with Plaintiff's argument that the ALJ erred in excluding any mention of Ms. Zimmerman's Third Party Function Report from his decision. (Doc. 14, at 7-8.) The ALJ is obliged to consider all of the evidence in the record, including statements from friends and family. 20 C.F.R. § 404.953(a). An ALJ may not reject such evidence without articulating specific reasons for doing so. Regenniter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999)(citing Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996). Further, complete disregard for Third Party Function Reports directly violates the Secretary's regulation requiring the ALJ to consider evidence from acceptable non-medical sources regarding a claimant's ability to work. See 20 C.F.R. § 404.1513(d)(4); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987); See also Yates v. Astrue, 2009 WL 4048491 (E.D. Cal. 2009).

Ms. Zimmerman's report describes the level of care that Ms. Zimmerman and other family members provide to assist Plaintiff in functioning at home. (A.R. 142-149.) As such, it is valuable both for corroborating or discrediting Plaintiff's testimony and for establishing a longitudinal record of Plaintiff's daily limitations. See SSR 96-97p; Regenniter, 166 F.3d at 1298. It is competent lay testimony that the ALJ must take into account. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2011). However, the ALJ made no mention whatsoever of Ms. Zimmerman or her statements in his decision. (A.R. 19-24.)

1    The ALJ's failure to address Ms. Zimmerman's report is a significant legal error warranting

2    remand for consideration of that evidence. <u>Lewis</u>, 236 F.3d 503; <u>see also</u> <u>Quintana v. Astrue</u>,

3    2010 WL 3397411 (E.D. Cal. 2010), <u>Vang v. Astrue</u>, 2010 WL 2943153 (E.D. Cal. 2010), and

4    <u>Zueger v. Astrue,</u> 2010 WL 3984807 (C.D. Cal. 2010)(all remanded where ALJ ignored lay

5    testimony.) On remand, the ALJ is additionally required to take Ms. Zimmerman's report into

6    account when making his RFC determination according to regulation. 20 C.F.R. § 404.1545(e).

7                                                              **VI.**

8                                                       **CONCLUSION**

9    For the reasons set forth above, the Court recommends <u>**GRANTING**</u> Plaintiff's Motion for

10   Summary Judgment and <u>**DENYING**</u> Defendant's Cross-Motion for Summary Judgment.

11   Remand is appropriate if additional administrative proceedings could remedy defects. <u>Lewin v.</u>

12   <u>Schweiker</u>, 654 F.2d 631, 635 (9th Cir. 1981). Therefore, the Court recommends that the case be

13   remanded to the Social Security Administration for further consideration of the Third Party

14   Function Report. The Court also recommends that on remand, the ALJ incorporate detailed

15   analysis throughout the sequential evaluation process which demonstrates full consideration of

16   Plaintiff's combined impairments in light of the entire record.

17   This Report and Recommendation is submitted to the Honorable Gonzalo P. Curiel, United

18   States District Judge, pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections

19   with the Court and serve a copy on all parties on or before April 17, 2013. The document should

20   be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be

21   served and filed on or before May 15, 2013. The parties are advised that failure to file objections

22   within the specific time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>,

23   951 F.2d 1153 (9th Cir. 1991).

24

25   <u>DATE: March 20, 2013</u>

26                                                                    Peter C. Lewis
                                                                      U.S. Magistrate Judge
27                                                                    United States District Court

28   cc:    The Honorable Gonzalo P. Curiel
           All Parties and Counsel of Record

23